## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ALAN E. MEYER, et al.,**

      **Plaintiffs,**

      **v.**                            **Case No.  07-2230-JWL**

**DAVID J. CHRISTIE, et al.,**

      **Defendants.**

_____

## MEMORANDUM AND ORDER

This lawsuit arises from a failed joint venture which was originally intended to plan, purchase land for, and develop a mixed-use residential and commercial development in Junction City, Kansas.  Plaintiffs Alan E. Meyer and John R. Pratt were joint venturers with defendants David J. Christie and Alexander Glen in developing the project.  The partnership was short-lived, however, because defendants Christie and Glen terminated the partnership promptly after learning about certain financial circumstances involving a loan from defendant Security Savings Bank, F.S.B. to one of Mr. Meyer's other businesses.  Plaintiffs assert various state law claims against defendants; the pertinent claims at this procedural juncture are plaintiffs' breach of contract and civil conspiracy claims against Security Savings arising from its alleged disclosure and mischaracterization of Mr. Meyer's confidential financial information.  This matter is currently before the court on Defendant Security Savings Bank, F.S.B.'s Motion to Dismiss (doc. #41) for failure to state a claim upon which relief can be

granted.  For the reasons explained below, the court will deny the motion as to plaintiffs' breach of contract claim, and will grant the motion and dismiss plaintiffs' civil conspiracy claim.

## BACKGROUND[1]

According to the allegations in plaintiffs' complaint, plaintiffs Meyer and Pratt formed a joint venture with defendants Christie and Glen for the construction of a mixed-use residential and commercial development on certain land located in Junction City, Kansas, to be called "The Bluffs."  Just months after work on the project had begun, the president of Security Savings divulged highly confidential and false information about the finances of Mr. Meyer and one of his other businesses, Engineered Roofing Products, Inc. (ERP), a business which is unrelated to the development project in Junction City.  Defendants Christie and Glen learned of that confidential information and used it as a justification to terminate the joint venture.  As a result, plaintiffs were denied millions of dollars in profits and unreimbursed expenses.

By way of background, plaintiffs Meyer and Pratt have considerable experience in both residential and commercial development, with particular expertise in the development, construction, and management of residential mixed-use projects which combine high quality

_____

[1] Consistent with the well established standard for evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court accepts as true all well pleaded factual allegations in plaintiffs' complaint.

affordable single and multi-family housing with commercial and recreational amenities. Defendant James Duff was a long-time business acquaintance of Mr. Meyer.  Mr. Duff had previously helped Mr. Meyer and certain of his companies obtain financing for various commercial projects while Mr. Duff had been a loan officer of Security Savings.  By 2005, Mr. Duff had moved on to become a senior officer at another bank.  In February of 2005, Mr. Duff approached Mr. Meyer and suggested that plaintiffs meet defendants Christie and Glen to discuss a significant opportunity to build a residential complex in Junction City.  Mr. Duff related that Messrs. Christie and Glen were established commercial developers in Junction City with many local government contacts, but who had no real experience in residential planning and development.  They were therefore seeking outside partners with that expertise, so Mr. Duff suggested that they speak with Messrs. Meyer and Pratt.

Messrs. Meyer, Pratt, Christie, and Glen met and formed the joint venture in March of 2005.  It was agreed that defendants Christie and Glen would contribute their contacts and expertise in the Junction City community, negotiate with local government officials for cash incentives to build the project, and coordinate the purchase of the property.  Plaintiffs Meyer and Pratt, on the other hand, would contribute their expertise in residential project development to the joint venture and would be responsible to plan, develop, manage, and coordinate construction of the project.  Work on the project commenced immediately. Plaintiffs Meyer and Pratt devoted substantial time and effort in planning the development of the project, including obtaining financing.  In June of 2005, they formally registered their joint venture company, Junction City Partners, LLC.  Work on the project continued and, in

July of 2005, Junction City executed a formal Memorandum of Understanding granting the joint venture the right to develop the project.

In mid July of 2005, Mr. Meyer received a phone call from Mr. Duff about ERP, another company in which Mr. Meyer had an ownership interest and that was unrelated to The Bluffs project. Mr. Duff advised Mr. Meyer that the "word on the street" was that ERP was having financial difficulties and that its loans with Security Savings were going to be called. Mr. Duff had been the officer that had approved and accepted those loans back when he had still been employed with Security Savings and Mr. Meyer was the personal guarantor of those loans. Mr. Meyer explained to Mr. Duff that this perception was erroneous because he believed that ERP was working with Security Savings on a refinancing plan. Mr. Duff told Mr. Meyer, however, that if Mr. Christie heard about these alleged difficulties he would likely back out of The Bluffs project. When Mr. Meyer protested that this reaction would be nonsensical, Mr. Duff replied, "It's just my impression."

Shortly after this phone conversation, Messrs. Christie and Duff called Mr. Pratt to meet with them. Believing the meeting was intended to discuss The Bluffs project, Mr. Pratt was surprised when the primary topic of the meeting turned out to be the alleged financial difficulties of ERP. At the meeting, Mr. Christie told Mr. Pratt that he had sought a loan from Security Savings to buy the property for The Bluffs, but that he had been turned down because the bank would not loan money to Mr. Meyer or any entity associated with him because he allegedly had a loan with Security Savings that was in default. According to Mr. Christie, Mr. Duff had previously been on a camping trip with the president of Security

4

Savings when he told Mr. Duff that Mr. Meyer had made fraudulent misrepresentations on a bank financing statement for ERP, and that some ERP equipment which was listed as collateral for Security Savings' loan to ERP was missing.  Mr. Duff had relayed this information to Mr. Christie.  Mr. Christie continued by explaining to Mr. Pratt that, as a result of receiving this information, he no longer wanted to do business with Mr. Meyer.

According to the allegations in plaintiffs' complaint, Security Savings and Mr. Duff, who worked with Mr. Meyer to coordinate and approve Security Savings' loans to ERP while he was still an employee at that bank, had duties of care and confidentiality to both Mr. Meyer and ERP to keep financial information about Mr. Meyer and ERP private and confidential.  In fact, the bank's privacy policy prohibited the disclosure of this information.

On July 21, 2005, Mr. Christie called Mr. Pratt and told him that he and Mr. Glen were terminating their partnership with Messrs. Meyer and Pratt.  After the phone call ended, Mr. Pratt conducted an independent investigation of Mr. Christie's allegations about Mr. Meyer.  He confirmed that none of the allegations were true.  When Mr. Pratt called Mr. Christie back to inform him about those findings, Mr. Christie stated that he had already made the decision to move forward on the project without Messrs. Meyer and Pratt.  Messrs. Christie and Glen did, indeed, move forward on The Bluffs project on their own.  Plaintiffs now seek damages from defendants Christie and Glen, related business entities, Duff, and Security Savings arising from being cut out of The Bluffs project.

Specifically, Mr. Meyer asserts a claim against Security Savings for breach of contract.   The complaint alleges that as a result of Mr. Meyer's long-term banking

relationship with Security Savings, he relied on Security Savings to preserve his and his businesses' confidential customer information in its possession, in accordance with the terms of its privacy policy, its implied duty to preserve and not disclose such information without his authorization, and/or its implied contractual duty of good faith and fair dealing. The complaint alleges that Security Savings was in possession of highly confidential personal and financial information about Mr. Meyer and his associated businesses solely because of its role as a lender to Mr. Meyer and those businesses, as its customers. By providing Messrs. Christie and Duff with this highly confidential information and mischaracterizing Mr. Meyer's and ERP's finances as well as Mr. Meyer's actions regarding ERP, Security Savings breached its express and implied contractual duties to preserve and protect his confidential information.

Plaintiffs also assert a claim against all of the defendants for civil conspiracy. The complaint alleges that Mr. Duff and Security Savings conspired with the Christie defendants to carry out their plan to tortiously usurp the project from plaintiffs and that the defendants took overt steps to accomplish these goals, including wrongfully revealing misleading and highly confidential information about the finances of Mr. Meyer and ERP.

Security Savings now moves to dismiss plaintiffs' claims against it. As to plaintiffs' breach of contract claim, Security Savings argues that the complaint does not adequately allege the existence of an express or implied contract, that any such contract fails for lack of adequate consideration, and that Mr. Meyer lacks standing to assert any such claim. Further, Security Savings argues that plaintiffs' civil conspiracy claim must be dismissed because

6

plaintiffs have not stated a claim against Security Savings for breach of contract or alleged any tortious conduct by Security Savings.

## MOTION TO DISMISS STANDARD

The court will dismiss a cause of action for failure to state a claim only when the factual allegations fail to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), or when an issue of law is dispositive, *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The complaint need not contain detailed factual allegations, but a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. *Bell Atlantic*, 127 S. Ct. at 1964-65. The court must accept the facts alleged in the complaint as true, even if doubtful in fact, *id.* at 1965, and view all reasonable inferences from those facts in favor of the plaintiff, *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006). Viewed as such, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 127 S. Ct. at 1965 (citations omitted). The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## DISCUSSION

7

For the reasons explained below, the court will deny the bank's motion to dismiss plaintiffs' breach of contract claim because the factual allegations in the complaint state a claim to relief that is plausible on its face.  The court will grant the bank's motion to dismiss as to plaintiffs' civil conspiracy claim because plaintiffs do not assert an independent tort claim against Security Savings.

## I.      __Breach of Contract Claim__

The essential elements of a breach of contract claim under Kansas law are as follows: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach.  *Commercial Credit Corp. v. Harris*, 212 Kan. 310, 313, 510 P.2d 1322, 1325 (1973).  Here, Security Savings contends that plaintiffs' complaint fails to state a claim under elements (1) and (2).

The bank's predominant argument that its privacy policy did not constitute a binding contract is that a unilateral statement of company policy does not create an express or implied contract.  In support of this argument, the bank relies on cases such as *Johnson v. Nat'l Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976) (company policy manual that was not published until after the plaintiff's employment began was only a unilateral expression of company policies and procedures; its terms were not bargained for by the parties and no "meeting of the minds" existed); *Berry v. General Motors Corp.*, 56 F.3d 1233, 1237 (10th Cir. 1995) (applying the Kansas Supreme Court's holding in *Johnson* under similar

circumstances); *Dyer v. Nw. Airlines Corps.*, 334 F. Supp. 2d 1196, 1199-1200 (D.N.D. 2004) (airline's privacy policy posted on its website did not constitute a contract with its customers in the absence of an allegation that passengers read and relied on the policy); and *In re Northwest Airlines Privacy Litig.*, 2004 WL 1278459, at *5-*6 (D. Minn. June 6, 2004) (same, where plaintiffs alleged that they relied on the privacy policy but not that they had actually read it). The court finds plaintiffs' reliance on these cases to be misplaced at this procedural juncture in light of the allegations set forth in plaintiffs' complaint. On a motion to dismiss, the court must of course accept the facts alleged in plaintiffs' complaint as true, view all reasonable inferences from those facts in favor of plaintiffs, and determine whether it is plausible based on those factual allegations that the privacy policy constituted a contract between Mr. Meyer and Security Savings. Viewed as such, the court cannot agree with the bank's attempt to characterize its privacy policy as nothing more than a mere unilateral statement of company policy. Plaintiffs' complaint alleges that Mr. Meyer had a long-term banking business and banking relationship with Security Savings; that in the course of that relationship he relied on the bank to preserve his confidential information according to the terms of its privacy policy; and that the bank had solicited his financial information when it requested that he act as a personal guarantor on the loans that it made to ERP. Inferentially, then, the bank's privacy policy was part and parcel of its offer to make the loan to ERP, which was accepted when Mr. Meyer divulged information to the bank with the understanding that the bank would keep it confidential in accordance with its privacy policy.

9

Under this view of the facts, the bank's privacy policy constituted part of Mr. Meyer's bargained-for exchange with the bank.

The Kansas Supreme Court's holding in *Johnson* does not dictate a different result. The plaintiff in *Johnson* argued that a company policy manual distributed by the employer to employees during Johnson's employment constituted an express contract or served as a basis for establishing a contract of employment by implication. Johnson argued that the statement in the manual that an employee shall not be dismissed without just cause was enforceable against the employer. The court reviewed the manual and found nothing expressly providing for a fixed term of employment and no language from which a contract to that effect could be inferred. 220 Kan. at 54, 551 P.2d at 782. The manual was published long after Johnson began his employment with the employer and, therefore, was only a unilateral expression of company policy and procedures. The court concluded that the terms of the manual were not bargained for by the parties and any benefits conferred by it were mere gratuities. No "meeting of the minds" occurred; instead, the manual was merely defendant's unilateral act of publishing company policy. 220 Kan. at 55, 551 P.2d at 782. Notably, *Johnson* came before the Kansas Supreme Court on appeal from a summary judgment ruling where the parties had already had an opportunity to explore the circumstances surrounding the alleged contract. Similarly, *Berry* came before the Tenth Circuit on appeal from a fully developed factual record. 838 F. Supp. 1479, 1482 (explaining the procedural history of that case). Consequently, in those cases the court was able to examine the facts set forth in the record to determine whether they established the existence

10

of an offer, acceptance, and manifestation of mutual assent necessary to form a binding contract.  In contrast, here, the court must infer at this procedural juncture that the bank's policy constituted part of Mr. Meyer's bargained-for exchange with the bank when it made the loan to ERC.

The two privacy policy cases cited by the bank also are unpersuasive.  *Dyer* is distinguishable because, there, the plaintiffs did not even allege that they had relied on the privacy policy whereas here Mr. Meyer does allege that he relied on the bank's privacy policy.  As to the court's holding in *In re Northwest Airlines Privacy Litig.* that an allegation that the plaintiffs relied on the privacy policy was insufficient to state a claim, the court agrees with the view expressed in *In re Jetblue Airways Corp. Privacy Litig.* that the court's holding in *In re Northwest Airlines Privacy Litig.* "rest[s] on an overly narrow reading of the pleadings."  379 F. Supp. 2d 299, 325 (E.D.N.Y. 2005) (holding the plaintiffs' complaint adequately stated a claim concerning the existence of a contract based on an airline's privacy policy where the complaint alleged that the plaintiffs relied on the policy in transacting business with the airline).  In sum, the facts alleged by plaintiffs in this case sufficiently state a claim that a contract existed between the bank and Mr. Meyer based on the bank's privacy policy.

The bank also argues that a contract claim based on its privacy policy fails for lack of consideration because the bank was required by law under the Gramm-Leach-Bliley Act to provide notice to its consumers of its privacy policies.  It is true that "an agreement to do . . . that which a person is already bound to do does not constitute a sufficient consideration

for a new promise." *Apperson v. Security State Bank*, 215 Kan. 724, 734, 528 P.2d 1211, 1219 (1974); *see also* Restatement (Second) of Contracts § 73 (1981) ("Performance of a legal duty owed to a promisor . . . is not consideration . . . ."). The fallacy in the bank's argument is that the provision of the Gramm-Leach-Bliley Act that the bank relies on, 15 U.S.C. § 6803(a), only requires the bank to disclose its privacy policies. *See also* 16 C.F.R. § 313.6 (listing nine specific categories of information that must be included in privacy notices). The statute cited by the bank does not dictate what the terms of the privacy policy must be. Thus, the bank has not shown that it had a pre-existing legal duty to safeguard the confidentiality of Mr. Meyer's information. Consequently, the argument raised by the bank concerning a lack of consideration is without merit.

The bank also argues that Mr. Meyer lacks standing to assert a breach of contract claim against the bank because the claim is premised on Security Savings' disclosure of financial information relating to ERP, not Mr. Meyer himself. This argument is without merit, as plaintiffs' complaint clearly alleges that Mr. Meyer provided the bank with his own financial information in connection with the "personal" guarantee of the bank's loan to ERP. And, the complaint alleges that Security Savings provided Messrs. Christie and Duff with "this" highly confidential information, mischaracterized not only ERP's finances but also Mr. Meyer's, and mischaracterized Mr. Meyer's actions regarding ERP. In doing so, Security Savings allegedly breached its contractual duties to preserve and protect his "personal" confidential information. Clearly, it can be inferred from these allegations that Mr. Meyer's

claim is premised on the bank's disclosure of his personal financial information, not just financial information relating to ERP.

In sum, the facts alleged in plaintiffs' complaint state a claim for relief on a breach of contract theory that is plausible on its face. The factual allegations are sufficient to raise a right to relief above the speculative level. Accordingly, the bank's motion to dismiss Mr. Meyer's breach of contract claim against it is denied.

## II.    Civil Conspiracy Claim

Lastly, the bank moves to dismiss plaintiffs' civil conspiracy claim against it on the grounds that plaintiffs do not assert an independent tort claim against Security Savings. This court has carefully considered this issue previously and has predicted that the Kansas Supreme Court would require that a civil conspiracy claim be predicated on a valid, actionable underlying tort rather than a mere breach of contract claim. *See JP Morgan Trust Co. Nat'l Ass'n v. Mid-Am. Pipeline Co.*, 413 F. Supp. 2d 1244, 1268-69 (D. Kan. 2006); *see also Kirk v. Nat'l Carriers, Inc.*, Case No. 05-1199-MLB, 2006 WL 618136, at *5 (D. Kan. Mar. 10, 2006) (agreeing with and following this court's holding in *JP Morgan Trust*). Because plaintiffs' complaint does not allege that Security Savings committed a separately actionable tort, then, the court will grant the bank's motion to dismiss this claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Security Savings Bank, F.S.B.'s Motion to Dismiss (doc. #41) is granted in part and denied in part as set forth above.

**IT IS SO ORDERED** this 24th day of October, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge