1450

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
2

3   ALAN E MEYER, et al.,           Docket No. 07-2230-CM

4     Plaintiffs,                   Kansas City, Kansas
                                    Date: 5/21/09
5        v.

6
    DAVID J CHRISTIE, et al.,
7
      Defendants.
8   .................

9                          TRANSCRIPT OF
              JURY TRIAL PROCEEDINGS - DAY NINE
10        BEFORE THE HONORABLE CARLOS MURGUIA,
                 UNITED STATES DISTRICT JUDGE.
11

12  APPEARANCES:

13  For the Plaintiffs:   Kenneth N. Hickox, Jr.
                          & Robert M. Millimet
14                        Bickel & Brewer
                          4800 Bank One Center
15                        1717 Main Street
                          Dallas, TX  75201
16
                          Matthew T. Geiger
17                        Gaddy Geiger & Brown PC
                          2345 Grand Blvd. - Suite 675
18                        Kansas City, MO  64108

19  For the Defendants:   Jeffrey L. Kennedy
                          Martin Pringle Oliver Wallace
20                        & Bauer, LLP - Wichita
                          100 North Broadway, Suite 500
21                        Wichita, KS  67202

22                        William P. Denning
                          Sanders Warren & Russell LLP
23                        40 Corporate Woods
                          9401 Indian Creek Pkwy - Suite 1250
24                        Overland Park, KS  66210

25


                 NANCY MORONEY WISS, CSR, RMR, FCRR

1451

1          I N D E X

2
   Charge Conference                              1452
3
   Court Read Instructions                        1463
4
   Closing Argument by Mr. Hickox                 1464
5  Closing Argument by Mr. Kennedy                1492
   Closing Argument by Mr. Hickox                 1507
6

7  Verdict

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NANCY MORONEY WISS, CSR, RMR, FCRR

1                    (Court returned to bench at 9:18 AM.)

2          THE COURT:  The court is ready to conduct

3    the charge conference involving the jury instructions

4    that the court intends to give to the jury in this case.

5    I want to thank the parties for meeting with Miss Walsh

6    at our pre-charge conference.  I would tell you I

7    believe that was very helpful and productive, and helped

8    the court get prepared for our charge conference.  The

9    parties have reviewed and conferred regarding the

10   court's proposed instructions.  And I believe you have

11   those proposed instructions in front of you.  My

12   understanding is that the parties have no objections to

13   Instructions 1 through 9.  The parties have agreed to

14   add, quote, unless otherwise stated in these

15   instructions, to Instruction Number 10, and I would let

16   you know on the court's final instructions that you'll

17   be given a copy of, the court has made that change.  The

18   parties have no objections to Instructions 11 or 13.

19   The parties have no objections to Instructions 16

20   through 19.  The parties have no objections to

21   Instructions 22 through 24.  Is that correct,

22   Mr. Millimet?

23          MR. MILLIMET:  It is, Your Honor.

24          THE COURT:  Mr. Denning?

25          MR. DENNING:  Yes, Your Honor.

1    THE COURT:  The court understands that six

2    issues remain outstanding.  The court has reviewed the

3    parties' requests and objections, and is now ready to

4    rule.  First, the element of breach of joint venture

5    agreement, which is Instruction Number 12, and verdict

6    form question number one.  Defendants request the

7    addition of the word, quote, oral, end quote, to

8    describe the alleged joint venture agreement.  Court

9    finds that plaintiffs' allegation of an oral joint

10   venture agreement is squarely before the jury.  There's

11   been no suggestion otherwise that the alleged agreement

12   at issue in this case is not oral.  Again, based on the

13   evidence presented at trial, the court's review of the

14   law, the court would overrule defendants' objection.

15   Number two, elements of breach of fiduciary duty,

16   Instruction Number 14.  Plaintiff requests the addition

17   of a sentence clarifying that under Kansas law, if the

18   jury finds that a joint venture agreement existed, then

19   fiduciary duties arise as a matter of law among the

20   joint ventures.  Defendant objects, arguing that the

21   requested addition is superfluous.  While the court

22   agrees with defendant that the requested addition is not

23   required, the court finds that such an addition fairly

24   and accurately states the law and may assist the jury in

25   understanding the instruction.  Plaintiffs' request is

1    sustained.  Defendants' objection is overruled.  Again,

2    the court has made the requested addition.  Number

3    Three, element of wrongful disassociation, Instruction

4    Number 15; plaintiff requests the addition of language

5    from KSA 56 A-602 B 1 which would instruct the jury that

6    a partners' disassociation is wrongful if it is in

7    breach of an express provision of the partnership

8    agreement.  Defendant does not object to the requested

9    addition.  Court has therefore made this change.  The

10   defendant objects to the instruction's inclusion of

11   language from KSA 56 A-602 B 2, instructing the jury

12   that a partners' disassociation is wrongful if in the

13   case of a joint venture slash partnership for a definite

14   term or particular undertaking, it occurs before the

15   expiration of the term or the completion of the

16   undertaking.  Court concludes, again, upon review of the

17   evidence and also the law, that the instruction fairly

18   and accurately states the law in light of the evidence

19   presented in this case.  Defendants' objection is

20   overruled.  Number Four, affirmative defense, unilateral

21   mistake, Instruction Number 20.  Plaintiffs argue that

22   the defense of unilateral mistake is available only if

23   there was a mistake and the other party knew or had

24   reason to know of the mistake and caused the mistake.

25   Court has reviewed the issue and concludes that the

1    instruction based on Pattern Instruction 124.05 B

2    correctly states the law, which is in the disjunctive

3    rather than -- rather than the conjunctive.  The court,

4    therefore, overrules plaintiffs' objection.  This ruling

5    also applies to Question Number Two on the verdict form.

6    Also, the burden of proof set out in this instruction

7    should be that of a preponderance of the evidence.  The

8    court has corrected this error.  Number Five, the court

9    notes for the record that plaintiff is preserving its

10   objection to the bifurcated proceedings on punitive

11   damages as it relates to Instruction Number 21 and the

12   verdict form.  For the reasons set out on the record

13   previously, this court finds that separate proceedings

14   are appropriate under Kansas law and the circumstances

15   of this case, and overrules plaintiffs' objection.

16   Number Six, the court also notes for the record that

17   plaintiff is preserving its objection to the absence of

18   its statute of frauds defenses from the instructions and

19   verdict form.  For the reasons previously set out in

20   this court's order on summary judgment and its ruling on

21   defendants' motion for judgment as a matter of law -- I

22   may have misspoke.  I said plaintiff is preserving this

23   objection.  It's actually defendants preserving its

24   objection.  The court overrules defendants' objection.

25   Those are the rulings in regards to the objections that

1   were made to the proposed instructions.  As I mentioned

2   to the parties, we're preparing those final instructions

3   for you at this time.  And other than that, we'll get

4   set up for your closing statements.  Unless there's

5   anything else, thank you.  We have that timer set up for

6   counsel.  The only thing I'll need to know in regards to

7   your time, Mr. Hickox, how do you want that split up?

8              MR. HICKOX:  I'm sorry, Your Honor, there is

9   one issue, just -- just in case -- to make sure the

10  record is clear.

11             THE COURT:  Yes.

12             MR. HICKOX:  I guess I need to renew my --

13  and I'm not sure where the status of this stands, but I

14  would renew our -- or make a motion as judgment of law a

15  to the statute of frauds affirmative defense.  I don't

16  think there is -- I think that legally, that -- that

17  affirmative defense should be stricken.  Under the law,

18  this court should rule that it doesn't apply in this

19  circumstance.  And I'd like to preserve that.

20             THE COURT:  I think the motion's all ready

21  been made.  If the defendant has any additional

22  response, or standing by their earlier response?

23             MR. DENNING:  Standing by our earlier

24  response, Your Honor.

25             THE COURT:  In regards to that motion for

1  reconsideration or also just a motion for preservation

2  of the record, the court understands the basis for the

3  motion.  For reasons previously set out on the record by

4  the court, the motion for reconsideration is denied.

5  Unless there's anything else, again, in regards to your

6  closing statements, Mr. Hickox, how would you like to

7  have your time split up?

8          MR. HICKOX:  Umm, Your Honor, I -- my guess

9  right now, I'll go -- I'll reserve about six minutes.

10  So, I think I'll go about 29 and reserve about six to

11  eight minutes, but --

12          THE COURT:  What happens, you'll have to be

13  mindful of the timer, it will start at 35, start going

14  towards 0.  So, if you want, at around 10 minutes, it

15  can actually start blinking, and it will blink, blink,

16  and maybe again at eight minutes.

17          MR. HICKOX:  That's great, Your Honor.

18          THE COURT:  Whatever time you stop at,

19  whatever you have left is all that you'll able to use in

20  the final portion of your closing.

21          MR. HICKOX:  I understand.  Thank you, Your

22  Honor.

23          THE COURT:  Does defendant want any warning

24  in regards to your expiration of your time?

25          MR. KENNEDY:  I think I'll be okay, Your

1    Honor.

2              THE COURT:  Okay.  Again, counsel, if you

3    would please, if it gets to 0, please stop where you're

4    at, because if not, I'll have to interrupt you.  Rather

5    not do that.  We'll go ahead and get you the

6    instructions.  The jury's getting here.  As soon as

7    everything's set up, call them in.  I'll read the

8    instructions.  As I mentioned, the jury members will

9    have a copy of the instructions to follow along.  I stop

10   with about three instructions to go, at which time we'll

11   go with your closing statements.  With the time that's

12   been set up for this, once I start with the

13   instructions, we're not going to take a recess until we

14   finish up with everything, your instructions and your

15   closing arguments, and at that time, the jury will go

16   and begin their deliberations.  Today's schedule is

17   actually going to be that the court's taking a recess

18   from 11:15 to 1:30, and the jury will be also informed

19   of that as well.  Final thing would be for the parties

20   to make sure in regards to the exhibits that are going

21   to be taken back to the jury room, we actually have a

22   form that we ask that you sign off on.  And understand

23   that there was some discussions in regards to the joint

24   exhibits and which ones of those will actually be sent

25   back to the jury room.  So, be prepared after they get

1  released from this room or asked to go begin their

2  deliberations, that you're ready to indicate to the

3  court which exhibits are going back there.  Thank you.

4  While we're on the record, Mr. Hickox, I just want to

5  make sure that our record's clear.  At the very end, my

6  fault, I apologize, in regards to what you said about

7  preserving the record on the affirmative defense and

8  statute of frauds, my understanding was the court had

9  previously all ready ruled and said that was not going

10 to be allowed at the summary judgment stage, but --

11         MR. HICKOX:  Your Honor, that's fine.  We

12 were -- I actually was slightly confused, because the

13 order -- when we read the order -- I'll be honest with

14 Your Honor, we didn't read the order to clearly to

15 strike that affirmative defense at the summary judgment

16 stage.  If that's what the court said, that's all I

17 wanted to do.  If it had not done, that I wanted to make

18 sure I made a JMOL motion for the jury to ask it.  But

19 if the court has previously stricken it, you cleared up

20 the confusion.

21         THE COURT:  Okay.  Just wanted to make sure,

22 because at summary judgment, as well as the charge

23 conference, the court has ruled that the defendant was

24 not entitled to that statute of fraud defense.  So,

25 wanted to make sure my language tracks with the earlier

1  rulings, and I think I even said that you made a motion

2  for reconsideration, which would -- I don't believe

3  that's what you're asking me to do.

4         MR. HICKOX:  And I wasn't, and Your Honor,

5  in fact, because I was not clear that the court had

6  previously stricken that defense, I was in effect making

7  a Rule 50 motion now before it went to the jury to

8  strike that defense.  So -- but apparently, that was

9  unnecessary, because the court has all ready previously

10  ruled that that defense was stricken.

11         MR. KENNEDY:  Well, maybe -- maybe we're

12  splitting hairs here.  But I thought -- I thought where

13  this issue was left was that on the summary judgment

14  motion, that the court had found there were fact issues

15  that remained to be resolved, and that when we

16  re-visited that issue as part of our Rule 50 motion, at

17  least my understanding at that time was that the court

18  wasn't striking the defense, but just said that there

19  was -- Your Honor, the defendant was -- no basis to end

20  the case basically on the basis of that defense.  So,

21  I'm not trying to get too technical here, but I guess I

22  didn't have an appreciation that the defense had been

23  completely stricken.

24         MR. HICKOX:  Your Honor, may I respond?  In

25  light of that, and in light of what the court has just

1  said, I would now make a motion for clarification of the

2  summary judgment order, that the court had in fact

3  previously stricken the affirmative defense of statute

4  of frauds on summary judgment and granted plaintiffs'

5  motion for summary judgment, and ask that as to that

6  defense, Your Honor.

7           THE COURT:  Anything else, Mr. Kennedy?

8           MR. KENNEDY:  Well, again, I don't have the

9  court's summary judgment order with me today, but I

10  don't think that's what the court did.

11          THE COURT:  In either case, you've heard

12  Mr. Hickox make his motion.  What response do you have

13  at this time?

14          MR. KENNEDY:  I guess the response I would

15  make is that notwithstanding the fact that there is no

16  instruction being given to the jury on the statute of

17  frauds issue, the -- that is an issue that certainly

18  they can look at with regard to the existence of a joint

19  venture, and to the extent anything further is going to

20  be said to the jury about the statute of frauds, I would

21  object to that, Your Honor.

22          THE COURT:  Anything else?

23          MR. HICKOX:  I have nothing else, Your

24  Honor.

25          THE COURT:  Just give me a moment.

         1                    (Whereupon court took a recess.  Proceedings

         2                    then continued as follows:)

         3              THE COURT:  One last thing for the record in

         4    regards to this issue.  Court apologizes if it was not

         5    clear, and based on that, has caused the parties some

         6    concerns about what the court's position is in regards

         7    to this affirmative defense issue.  The court would

         8    note, I've heard plaintiffs' motion that's been made at

         9    this time, defendants' response.  For the record,

        10    defendants are preserving this issue for the record for

        11    any further review, if they believe it's necessary.  The

        12    parties are aware this is not in the front of the jury

        13    regarding any instructions having to do with that.

        14    Court is not going to allow the parties to argue this

        15    issue in front of the jury.  They were not instructed on

        16    it, and it would not be appropriate given the court's

        17    prior rulings.  You have your instructions at this

        18    point, and we're ready to call the jury in.

        19                    (Jury entered courtroom at 9:45 AM.)

        20              THE COURT:  Good morning.

        21              THE JURY:  Good morning.

        22              THE COURT:  Thank you.  Hopefully everybody

        23    had a good night's rest.  As you were told when we

        24    stopped yesterday, that the parties had presented to you

        25    all the evidence in this case.  And again, if you recall

1   from the very first day that you were here, you were

2   told that your role here as members of the jury was to

3   receive all the evidence, and then follow the

4   instructions of law the court were to give you.  We're

5   at the point now where the court is going to give you

6   your instructions.  After I've given you your

7   instructions, the parties get an opportunity to make

8   their closing statements to you, and then I follow up

9   with a couple more instructions.  The rule we have here

10  in our court is that you actually read along, as I read

11  to you these instructions, and I have to read each one

12  of these to you.  So, we'll start with Instruction

13  Number 1.

14            (Court read the instructions to the jury.)

15            THE COURT:  Thank you.  If you'll stop right

16  there, I read some final instructions to you after the

17  parties have made their closing arguments.  The last

18  pages of that packet that you've been given actually

19  contain the verdict form that will be used by the jury,

20  and there may be some mention of this verdict form by

21  the parties in their closing argument, but you have a

22  copy of the verdict form there as well.  At this time,

23  the court's going to ask if the parties are ready to

24  give their closing arguments, and the order in which we

25  proceed is the plaintiff will go first, and then they'll

1   stop, and then defendants will give their entire closing

2   argument, and then plaintiff gets to finish up with

3   whatever time they have left for the rest of their

4   closing argument.  At that point, I'll read to you your

5   final instructions.  Thank you.  Mr. Hickox.

6           MR. HICKOX:  Thank you, Your Honor.  Ladies

7   and gentlemen, I want to thank you again for your time

8   and service over these last two weeks.  I know,

9   Mr. Meyer and Mr. Pratt and the rest of the team know

10  that you've taken your duties very seriously.  We've

11  seen that here.  And now, we've done our best over these

12  last two weeks to try to present to you all of the

13  evidence that the law -- the relevant and admissible

14  evidence that the law will allow.  But there are

15  unanswered questions, ladies and gentlemen, and now you

16  must decide them.  And I'd like in these few minutes

17  that I have with you to look at a little bit of the

18  evidence that we've presented at trial, and the

19  defendants have submitted at trial, that will allow you

20  to determine that it's more probable than not, slightly

21  more likely, overwhelmingly more likely than not that

22  Mr. Meyer and Mr. Pratt entered into a joint venture

23  agreement with Mr. Christie and Mr. Glenn on March 4th,

24  2005, they entered into a partnership, and as was

25  testified here, there were five terms of that

 1    partnership.  Mr. Christie and Mr. Glenn would bring
 2    their expertise to the table with regard to financial
 3    incentives, and having influence and contacts with the
 4    city in order to make this development opportunity a
 5    reality.  Mr. Meyer and Mr. Pratt would bring their
 6    residential development and construction expertise.
 7    Mr. Christie testified that he needed that in order to
 8    make the project a reality.  The project would be called
 9    The Bluffs.  The partnership would be named Junction
10    City Partners.  They would share in the profits and
11    losses from the joint venture on a 50/50 basis, whatever
12    those might be.  And that Mr. Christie would agree that,
13    because time was of the essence, he would use the
14    existing entity of defendant DJ Christie Inc to purchase
15    the land and later assign it to the joint venture.  Now,
16    ladies and gentlemen, if you recall when Mr. Denning
17    came up before you last week and gave the defendants'
18    opening, one of the first words he mentioned to you was
19    that he wanted you to remember that there's no written
20    agreement.  Your Honor has just told you by reading you
21    the instructions that that doesn't matter, that that's
22    just one fact for you to consider.  If the law required
23    that there be a written agreement to form this
24    partnership, we wouldn't be here today.  So, all of the
25    evidence that defendants have put forward in these last

1   days trying to show you that there's no written

2   agreement, you can set that aside.  That's just one fact

3   among all of the facts that you need to consider as to

4   whether or not the parties -- the evidence shows that

5   the parties intended on March 4th, 2005 to enter in

6   expressively or by implication this oral partnership

7   agreement.  One of the other things that Mr. Denning

8   mentioned to you was there were a list of 14, I think he

9   called them, material terms that were missing from this

10  alleged agreement.  Well, again, Your Honor has told you

11  that there are no miss-- material terms that are needed

12  beyond what the parties agreed to.  That if the evidence

13  shows that those terms were entered into, that they

14  intended to enter into those particular terms, 50/50

15  partners, call it The Bluffs, Junction City Partners,

16  and I forgot one thing, there was an agreement that

17  Dove-- the partnership would eventually hire Dovetail to

18  be the general contractor.  Those are the material terms

19  in evidence.  If you believe that the evidence and the

20  circumstances show that they entered -- intended to

21  enter into that agreement, then that's the only material

22  terms necessary.  You might recall that many of those

23  things -- as you sat through the trial, you may have

24  come to realize that many of those 14 items that

25  Mr. Denning mentioned, they didn't know what buildings

1  they were going to build, they didn't know exactly how

2  much money they were going to make, they didn't know

3  whether there would be one pool or two pools, those are

4  the kind of things that would have been hammered out in

5  the construction agreement that they promised to give to

6  Dovetail.  They broke that promise before that agreement

7  was ever entered into.  Those are general contractor

8  terms.  But the evidence here is that this as a

9  development agreement, a development partnership.  They

10 tried to confuse you in the evidence.  They pointed out,

11 they tried to say, oh, you heard Mr. Christie say, we

12 only had an agreement to talk about general contractor.

13 That wasn't what the agreement was, ladies and

14 gentlemen.  That was part of it.  Certainly, it was true

15 that the partners agreed, Mr. Meyer and Mr. Pratt agreed

16 to bring their residential construction experience to

17 the table to make the development partnership a success.

18 Certainly, it was agreed that Dovetail, in reliance on

19 the promise that Mr. Christie and Glenn made, would go

20 ahead and expend resources to start construction,

21 because they relied on the promise that they would

22 eventually enter into a contract for construction.  But

23 development -- developers do things like acquire land,

24 decide what to build, obtain financial incentives,

25 evaluate whether to even make the property -- whether

```
 1    it's even feasible.  You heard Mr. Figert's un-rebutted
 2    expert testimony as to that issue.  That's what a
 3    development partnership does.  Contractors provide
 4    construction services, prepare budgets, retain
 5    subcontractors.  And then you heard Mr. Christie testify
 6    during my examination of him of all the many things that
 7    Mr. Meyer and Mr. Pratt did to pursue this opportunity,
 8    to perform their obligations under the partnership -
 9    site work, site planning, that's something a developer
10    does, hiring a civil engineer, that's what a developer
11    does, registering entities to sign a contract on behalf
12    of the partnership, that's what a developer does,
13    presenting POWERPoint presentations to city officials to
14    obtain financial incentives, that's what a developer
15    does, arranging for project financing, that's what a
16    developer does.  So, when you're listening to their
17    closing and you remember -- recall the evidence in this
18    case, remember that all these material terms they say
19    are missing, it's not development terms.  It's not for
20    the partnership that was agreed to.  It's for the
21    contract that never was made because they broke their
22    word.  And what they want you to do is ignore this
23    evidence, ladies and gentlemen, and you heard
24    Mr. Christie use the word insane.  He wants you to
25    believe that you should ignore the evidence that a
```

1  partnership was entered into, that you should ignore the
2  actions that the parties took to perform on their
3  obligations, you should ignore the evidence we presented
4  and they presented through their own witnesses that they
5  intended to enter into this partnership, because it
6  would be insane to do that on that day with -- on those
7  facts because of what he knew at that time about
8  Meyer -- Mr. Meyer and Mr. Pratt and what Mr. Glenn
9  knew.  Well, ladies and gentlemen, it wasn't insane.
10 There was two -- one very good reason really why they
11 did it, because they wanted to make money and they
12 needed to act now.  You heard the testimony.  Speed was
13 of the essence.  Mr. Christie agreed with me that the
14 sense of urgency from the city and the military was
15 beyond expectation.  Those were the words.
16 Extraordinary.  They wanted to expand the tax base and
17 growth.  They wanted to ensure that the Fort Riley
18 build-up would happen.  They wanted to ensure that they
19 would get their opportunity to do that.  The city wanted
20 it done now.  It was a lucrative opportunity that
21 presented itself.  The city was willing to put millions
22 of dollars into this project.  And when they did so and
23 built it, the troops were coming, there was a
24 significant housing need, they were going to make a lot
25 of money.  It was going to be worth a lot of money at

```
 1    the end.  And Mr. Christie testified and Mr. Glenn
 2    testified, and Mr. Christie wrote to the city in a
 3    letter saying, if we're going to do this, I need a
 4    residential partner.  I need a partner with residential
 5    experience, not a general contractor.  He could have
 6    hired that anyway.  I need partner.  Mr. Glenn told you
 7    that from the outset, they were looking for a 50/50
 8    partner to go in on this deal.  He needed that partner
 9    with turnkey residential experience or the project
10    wasn't going to happen.  But on that day when he met
11    Mr. Meyer and Mr. Pratt to size them up, he had all
12    ready considered one of those partners, McPherson, and
13    rejected it.  And he testified that Mr. Duff was urging
14    him to go into business with Jack Deboer, and he was
15    intimidated because he didn't know if he'd be able to
16    keep control of Mr. Deboer 'cause he was so large.  So,
17    he needed -- he had to act then, and on those facts and
18    on those circumstances, it made perfectly good business
19    sense for Mr. Christie and Mr. Glenn to rely for their
20    due diligence in these circumstances on Mr. Duff.
21    Mr. Christie testified that Mr. Duff was somebody who he
22    trusted his checkbook with.  A 20-year relationship that
23    he had with him.  20 years, he respected it.  He knew
24    that Mr. Meyer and Mr. Pratt, Mr. Duff told him, had the
25    same relationship with Mr. Duff.  So, Mr. Duff knew both
```

1    Mr. Meyer and Mr. Pratt's financial capability, knew

2    their operational capability, and knew the same thing

3    about Mr. Christie and Glenn.  He told Mr. Glenn that.

4    He said, that's the reason I think these are good

5    partners.  So, Mr. Christie and Mr. Glenn relied on

6    that, on Mr. Duff's -- should I continue, Your Honor?

7              THE COURT:  Let's wait a moment to see if we

8    get our lights.

9              MR. HICKOX:  They don't teach you this in

10   law school.

11             THE COURT:  If you'll just bear with us,

12   we're going to see what happened.

13             MR. HICKOX:  If this continues, I'm going to

14   threaten to start over from the beginning.

15             THE COURT:  I don't think I need the

16   power -- microphone on for you, but we're not sure what

17   happened.  But there's been an interruption in our power

18   as you can tell.  We're looking into it at this time.

19   So, for circumstances out of our control, we'll go ahead

20   and take a recess at this time, jury members.  So,

21   please remember your admonition.  No one's to talk to

22   you about the case.  And even among yourselves, you

23   can't talk about the case, and please keep that in mind.

24   So, we'll keep you posted at this time.  But court

25   stands in recess.  Thank you.  Why don't you leave your

1    instructions there on your chair, if you would please.

2    Thank you.

3                 (10:15 AM jury left following a power

4    failure.)

5                 THE COURT:  Sorry about that.  So, we'll

6    look into it.  There seems to be some kind of

7    interruption.  We have a phone call in to our local

8    Board of Public Utilities.  At times, for some reasons,

9    we do lose power here in the courthouse, and I don't

10   know if some transformers have gone out or something

11   took place, but we'll take our break.  We'll consider

12   what we need to do in regards to the interruption

13   regarding your closing.  Just depend on how long we're

14   on a break, but there might be --

15                MR. KENNEDY:  Your Honor, whatever we need

16   to do to put Mr. Hickox to the place that he wants to

17   get to is perfectly fine with us.  This has to be one of

18   his nightmares come true.

19                MR. HICKOX:  Your Honor, if I wasn't almost

20   50, I'd probably be panicking right now.  But in the

21   scheme of things --

22                THE COURT:  Well, again, I apologize for

23   that.  And we'll look into it, and if you could just

24   stay nearby, we'll keep you posted.  Thank you.

25                MR. HICKOX:  I don't think the monitors for

1  the jury are on.

2          THE COURT:  Okay.  All right.  Thank you.

3  Well, there's always a first time for things to happen

4  and I apologize, Mr. Hickox in regards to that

5  interruption.  You know, what we've been told is there's

6  some kind of power break somewhere.  We're connected

7  with all these other places in this area.  I don't know

8  if they actually will be able to determine what

9  happened, but power's back on.  What -- what do you want

10  to do?

11          MR. HICKOX:  I'll just continue on.  I guess

12  I could try to plead for a one minute handicap or

13  something, but I'll just go back and continue on.  I

14  think that's -- I'm fine.

15          THE COURT:  Are you sure?

16          MR. HICKOX:  If the court's willing to give

17  me an additional minute just to go over the last sort of

18  minute that I went in and lead back in, I'd appreciate

19  it.

20          THE COURT:  Go ahead and give you an

21  additional two minutes to do that.

22          MR. HICKOX:  Okay.  Thank you, Your Honor.

23          THE COURT:  Call the jury back.

24          (Jury reentered courtroom at 10:29 AM.)

25          THE COURT:  Thank you, jury members, and I

1   can assure you that what took place was not the fault of

2   any of the parties or the court.  It's unfortunate that

3   took place, and I would trust that it's not going to

4   interfere with your ability to take in what's been

5   presented in our courtroom.  And specifically,

6   Mr. Hickox was making his closing statements to you.  So

7   again, we'll continue more or less where he finished.

8   And again, please be alert and attentive to these

9   statements that are being given to you.  Mr. Hickox.

10          MR. HICKOX:  Thank you, Your Honor.  And

11   thank you once again, ladies and gentlemen, for deciding

12   to come back.  When we left off, I was talking about why

13   it made perfectly good business sense for defendants to

14   enter into an oral partnership agreement with Mr. Meyer

15   and Mr. Pratt on March 4th, 2005.  Wasn't insane at all.

16   It made perfectly good business sense.  They had to act

17   now, they had to act to develop this opportunity, and on

18   that facts and circumstances, they decided to rely on

19   Mr. Duff's bona fides of Mr. Meyer and Mr. Pratt's

20   capabilities and financial capabilities and operational

21   capabilities to be able to be the residential partner in

22   this partnership, just as Mr. Meyer and Mr. Pratt

23   decided to rely on Mr. Duff's bona fides of

24   Mr. Christie.  And so, ladies and gentlemen, they moved

25   forward to fulfill their promises to each other.  The

1   parties -- we've shown you overwhelming evidence in this
2   case that not only did the parties intend to enter into
3   a partnership on that day, but they acted on those
4   promises.  I can't in this brief time I have with you go
5   over all of these things, but when you go back to the
6   jury room, you'll be able to review the documents which
7   we've submitted in this case.  You'll be reminded of the
8   testimony that was given in this case.  As early as days
9   after, Mr. Pratt testified that he arranged with
10  Mr. Christie to go visit the site, to begin development
11  work, site surveying work, developing site plans.  From
12  March 4th through May 22nd, numerous actions by the
13  parties showing their -- demonstrating their intent,
14  including signing a civil engineering contract, a
15  geotechnical services contract, preparing legal
16  information and budgets for the city, it continued on
17  through May.  Mr. Meyer and Mr. Christie jointly
18  delivered a POWERPoint presentation to the city in order
19  to obtain $15 million in financing for the project.
20  They filed the articles of organization of Junction City
21  Partners LLC.  It's not a coincidence that that's the
22  same name that I believe the testimony -- Mr. Meyer and
23  Mr. Pratt testified they believed it was Mr. Christie
24  that came up with that name that day.  Not coincidence
25  that they filed the articles of organization at the same

1    time they were negotiating and drafting this important

2    memorandum of understanding, MOU, and that's the name

3    that appeared in that document.  Mr. Sweatt,

4    Mr. Christie's own director of construction at the time,

5    when contacted independently by a potential

6    subcontractor said, oh, you got to talk to Dovetail,

7    we're teaming up with them.  That's Mr. Christie's own

8    employee.  And it continued.  On July 5th, the MOU is

9    signed.  But even after that, the next day, Mr. Christie

10   at Alan Meyer's personal request sent his financial

11   information along with Mr. Glenn's to various banks to

12   obtain financing for the project.  They participated in

13   the development agreement -- initial development

14   agreement discussions.  They continued moving forward

15   with obtaining subcontractors for the project.  As late

16   as August 26th, 2005, ladies and gentlemen, the site

17   plans that Kaw Valley Engineering was preparing still

18   showed Junction City Partners LLC as the owner, not The

19   Bluffs LLC.  The witness testimony in this case, not

20   only the witnesses that Mr. Meyer and Mr. Pratt -- that

21   we brought before you, but their own witnesses, ladies

22   and gentlemen, have shown that the parties intended to

23   be partners.  Mr. Malinowski testified that Mr. Christie

24   told them that he was to be working with Dovetail and

25   Mr. Meyer and Mr. Pratt because Mr. Christie said that

1   they were involved -- he had achieved an understanding

2   from Mr. Christie that they were working together on the

3   project.  Miss Bushyhead, Mr. Christie's own attorney

4   who he hired to negotiate and draft the MOU on behalf of

5   the partnership, said that she was circulating that --

6   those drafts because -- to Mr. Meyer and Mr. Pratt,

7   because they were the ones involved with Mr. Christie

8   and Mr. Glenn in the project at that time.  Mr. Barnes

9   testified that he believed they were partners because

10  Mr. Christie told us that they were partners.  The city

11  manager for Junction City, the one responsible for

12  getting this MOU approved and later getting the

13  development approved, that's what he testified to,

14  twice.  Miss Von Feldt testified that she --

15  Mr. Christie explicitly introduced Mr. Meyer in Las

16  Vegas at this convention to a third party as his

17  partner.  The only -- the only testimony they have from

18  any individuals in this case that rebut that is their

19  own testimony.  I told you when we began this case,

20  ladies and gentlemen, that you were going to have to

21  decide who was telling the truth.  It's a tough

22  decision.  But that you wouldn't have to just rely on

23  Mr. Pratt and Mr. Meyer's word.  But they're asking you

24  only to rely on their word, because they're the only

25  ones that said we never were partners.  They put up

1    Miss Conley's deposition at the end of yesterday.  She
2    initially said, it was my understanding they weren't
3    partners, they weren't partners.  But if you notice, she
4    admitted on questioning that she really had no idea of
5    whether or not they entered into a partnership
6    agreement.  She wasn't with them the whole time.
7    Mr. Christie never characterized the relationship to
8    her, either way.  Neither did Mr. Meyer and Mr. Pratt.
9    Mr. Duff said the same thing.  He said, oh, I -- I don't
10   know what they -- if they were partners or not.  I -- I
11   was never told either way.  But Mr. Barnes was.
12   Miss Von Feldt heard Mr. Christie say it.
13   Mr. Malinowski believed they were involved from his
14   conversations with Mr. Christie.  And so did
15   Miss Bushyhead.  When they close, ladies and gentlemen,
16   here's what they won't able to show you.  Here's what
17   they can't show you because it isn't in evidence.
18   There's no communication from them throughout this four
19   and a half months to stop work.  Stop.  What are you
20   doing?  Why are you hiring subcontractors?  Why are you
21   developing budgets?  Why are you doing site work?  Why
22   are you meeting with the city to try to get financial
23   incentives?  Stop.  We're not your partners.  No
24   communication from defendants that say we're only
25   considering you as general contractors, not as 50/50

1   partners.  And no communications from them that lay out

2   all these alleged reasons you heard on the record that

3   they say that they had a problem with us for, lack of

4   financial experience, lack of financial capability, not

5   getting a contractor qualification sheet, all the things

6   that, by the way, that Mr. Christie testified and Mr.

7   Glenn testified that they told us, but nobody backed

8   them up.  There's not one document in this case that

9   lists any of those reasons.  And in fact, when

10  Mr. Christie testified that he told Mr. Pratt that at

11  this meeting that occurred at the end of July, Mr. Pratt

12  said that never happened.  And more importantly, the

13  only other person at that meeting, he said it didn't

14  happen either, Mr. Duff.  And that's their witness,

15  ladies and gentlemen.  And through this whole time

16  apparently, they'd been intending all along to use us to

17  get the MOU, to use us to get a commitment from the city

18  for $15 million, and then kick us to the curb.  As early

19  as on June 27th, 2005, Miss Bushyhead, when Mr. Coulter

20  asked, hey, here's a copy of the articles of

21  organization, she testified that he was inquiring of

22  her, you know, this draft operating agreement, the

23  document, by the way, that we circulated and we prepared

24  in order to memorialize the partnership agreement of

25  March 4th, we'd always intended to memorialize it in

1    writing.  Of course we did.  But they weren't coming
2    back to us.  What's going on?  She says, do I keep
3    stalling this guy?  Never went back to Mr. Coulter.
4    There's no communication from Miss Watts saying, I don't
5    understand, we're not your partners.  Mr. Christie
6    didn't tell her to write that.  Mr. Christie said he had
7    a discussion with Miss Watts saying all the reasons they
8    were putting it on hold.  Why didn't Miss Watts write
9    that back to Mr. Coulter at that time?  It never
10   happened.  Ladies and gentlemen, we've talked a lot
11   about the MOU in this case, and I think you've been here
12   for a while, and I think you understand why it was
13   important.  But ladies and gentlemen, the MOU, they've
14   tried to downplay it, they've tried to downplay its
15   legal significance.  You know, initially, you know, they
16   tried to say it's not worth anything, it's not a binding
17   agreement.  They paid lawyers for 15 days a lot of
18   money.  They personally negotiated it themselves.
19   Mr. Christie made a lot of detailed revisions to that.
20   It was important.  It had legal significance.
21   Miss Watts told you that it was important to the city
22   'cause they needed it.  It was important as a building
23   block in ultimately obtaining the $15 million that were
24   promised.  Miss Bushyhead said Mr. Christie needed the
25   MOU because he needed the insurances that that

1   $15 million would be committed to before he moved

2   forward on the land sale contract.  The feasibility

3   period was up.  Do you recall when we looked over that

4   document?  And Junction City needed the MOU to convince

5   the military that the troops -- they would be able to

6   house the troops that were coming.  And no better person

7   has described the importance of the MOU, ladies and

8   gentlemen, than Mr. Christie himself.  When asked, he

9   said, because it was important, because it made the

10  project more feasible and the land more valuable.

11  Non-binding or not, that's what it did.  And as we

12  pointed out before, despite the non-binding nature of

13  the agreement, it was an important building block.  It

14  was the precursor to the final development agreement in

15  which they got the $15 million.  They talked about,

16  well, it wasn't the same, it wasn't constructed in the

17  same way.  Said $15 million in July, said $15 million in

18  November.  And we eventually got 8 million of that for

19  the promised phases we built.  No dispute.  And

20  plaintiffs were critical in helping the partnership

21  obtain that MOU and the $15 million.  They were the

22  ones, Mr. Meyer and Mr. Pratt, that initially determined

23  that you could get $15 million instead of the 5 million

24  that Mr. Christie initially had put out.  They developed

25  and prepared the POWERPoint presentation.  They

1  presented it jointly.  They and their attorneys were

2  also involved in the negotiation of that document, and

3  Miss Bushyhead said that without plaintiffs as partners,

4  David Christie could not have convinced Junction City to

5  pass that MOU, that precursor document, because they

6  were the ones that were bringing the residential

7  expertise.  They were the ones that the city had to

8  become convinced on to deliver the quality housing that

9  deserved the incentives.  And that's why, ladies and

10  gentlemen, while Miss Watts was directed to go into a

11  holding pattern on the operating agreement revisions,

12  she certainly wasn't directed to go into a holding

13  pattern on negotiating the MOU.  She said full speed

14  ahead.  And so, ladies and gentlemen, on July 5th, we've

15  seen this document a number of times in this case, the

16  MOU was signed.  We've noticed it's signed on behalf of

17  Junction City LLC.  It's not a coincidence that Junction

18  City Partners is the name they agreed to call the

19  partnership that Mr. Christie named.  He signed it as

20  manager of the entity.  They got the commitment from the

21  city -- the intention of the city to get the $15 million

22  which they eventually received in the development

23  agreement.  And as Mr. Christie himself couldn't put it

24  any better yesterday, in that document he had no problem

25  with full disclosure that he and Alan Meyers were

1   partners in Junction City Partners, the entity that was

2   going to build The Bluffs, the entity that was

3   committing to build it and to receiving $15 million.

4   Ladies and gentlemen, besides the legal significance of

5   this document, this document is significant for the

6   decision you have to make.  Who's telling the truth?

7   This document tells you who's telling the truth.  Even

8   if it's a non-binding agreement, it shows that

9   Mr. Christie and Mr. Glenn knew on this date that they

10  were partners in Junction City Partners to build this.

11  He handwrote instructions right above Alan Meyer's name.

12  He couldn't have made a mistake.  But that's what he

13  says he did.  Their only rebuttal to this evidence as

14  well as the other evidence of this is, I made a mistake.

15  It was the wrong entity.  I thought I was signing on

16  behalf of a preexisting entity that was involved in

17  another project.  But all of the evidence they showed to

18  you, that only points to one thing, that after

19  March 4th, 2005, that after they entered into the

20  Junction -- Junction City Partners became a reality, and

21  internally they made a mistake, signed the lease in the

22  wrong name, because both of 'em existed at that point,

23  now JCI and JCP exist, one of his employees actually put

24  in the wrong name, they accidentally signed a lease into

25  their internal management system, and for the next

1  several months, they continued to make that mistake
2  about the Goody's project.  There's never been a mistake
3  about The Bluffs project.  He all ready told you.
4  Mr. Christie said Mr. Meyer was never involved in The
5  Bluffs project -- in the Goody's project.  Junction City
6  Investors was never involved in The Bluffs project
7  actually.  Mr. Meyer was never a partner in Junction
8  City Investors.  So, how did this mistake in their own
9  property management system rise to the level of
10 Miss Bushyhead and Miss Watts who circulated the draft
11 of the agreement and put that name in?  We know why,
12 ladies and gentlemen.  Because they can't explain away
13 this so-called discrepancy, this so-called error.  They
14 can't explain away this document.  On the same day that
15 they were -- that they put that in, Mr. Coulter wrote to
16 Miss Watts and said, hey, here's the articles of
17 organization that we filed by Junction City Partners
18 LLC.  I did it because Mr. Meyer has all ready talked
19 with Mr. Glenn and Mr. Christie, and they agreed this
20 had to be done, because otherwise we can't sign the MOU.
21 So, I've done it, and there you go.  Mr. Christie tried
22 to deny this evidence and downplay it by saying, ah, I
23 don't read everything across my desk.  It's not
24 important.  Miss Watts testified that she forwarded to
25 him and advised him of what happened, his own attorney.

1  Ladies and gentlemen, I have a seven-year old daughter,
2  the light in my life.  Her name is Reagan.  Last year, I
3  heard a noise when I was up in the bedroom, heard a
4  crash, walked down the stairs, and there's my daughter,
5  my darling daughter Reagan standing on the floor next to
6  a big bookcase we have in my den.  And there's pieces on
7  the floor that I realize are my wife's -- a memento -- a
8  cherished memento that my wife's grandmother had given
9  her around the same time that she was my daughter's age.
10  It's a tea cup, tea cup from Gettysburg, a Civil War
11  memento, kind of kitschy.  But anyway, she'd been trying
12  to get at that for a couple of years.  Now she was big
13  enough to get at it.  Well, I looked at her, and I said
14  Reagan, what happened?  She said, oh, daddy, I didn't do
15  it.  I said, but Reagan, you're holding a piece of the
16  tea cup in your hand.  She said, oh, daddy, it's not the
17  same one, it's another tea cup, it's my princess tea
18  cup.  That's what Junction City Investors is, ladies and
19  gentlemen, it's that princess tea cup.  And so, ladies
20  and gentlemen, on July 21st after receiving the benefits
21  of our performance, after -- after we conferred benefits
22  in order to get the MOU to have the partnership that we
23  were involved in obtain $15 million commitment from the
24  city, after doing numerous site planning, after doing
25  numerous other things in fulfillment of our promises to

1   them, after keeping our promises, on July 21st, they

2   called -- Mr. Christie called Mr. Pratt up and

3   terminated the relationship.  Now, there's some

4   confusion in the time line.  Mr. Christie testified that

5   he thought that was at this personal meeting that he and

6   Duff and Mr. Pratt attended, but he didn't remember a

7   phone call.  Once again, however, Mr. Pratt and Mr. Duff

8   remember it differently.  Mr. Duff testified, their own

9   witness, that at the end of that meeting, might have

10  been some discussion about Mr. Christie's concerns, but

11  at the end, after Mr. Pratt rightfully said, doesn't

12  sound like Alan, I don't think this is true,

13  Mr. Christie told him, you go -- go and talk to Alan and

14  get back to me.  Little did Mr. Pratt know that around

15  that time or shortly thereafter, we're not sure, but we

16  know that on July 15th, 2005, Mr. Christie sent a letter

17  to Margo Conley saying, we're terminating the

18  relationship, because in part, Alan Meyer at Dovetail

19  has allegedly defaulted on a loan with a Kansas bank,

20  and that Dovetail has misrepresented their experience

21  and financial ability.  Ladies and gentlemen, as to the

22  second issue, there's been absolutely no evidence in

23  this case that Dovetail ever misrepresented their

24  financial ability or operational capability.  No

25  communication, no testimony.  The only thing they rely

```
 1   on is Mr. Christie's testimony that Mr. Duff told him
 2   that, but Mr. Duff never testified to that.  Never.
 3   Mr. Christie said, oh, I was told they built, you know,
 4   this many apartments, and no, they hadn't.  Mr. Duff
 5   never testified to that.  He wants you to just take his
 6   word, despite the evidence to the contrary; despite the
 7   testimony of Mr. Duff to the contrary.  Yet, Mr. Duff
 8   also testified he disagrees that the only two people in
 9   that meeting.  As I said before, Mr. Christie didn't say
10   anything about any other alleged problems.  He only
11   talked about Alan Meyer's problems with this ERP loan.
12   We've heard a lot about it.  The only thing I need to
13   say is that when Mr. Christie pointed out, oh, this bank
14   document proves that he was lying to me.  Harsh words
15   that he repeated in this courtroom; dead beat, liar.
16   When I showed him that document, he said, oh, well,
17   maybe all he told me was I had made arrangements to pay
18   off the loan before I resigned on June 15th from ERP.
19   He's no longer involved with that company.  The
20   testimony is when Mr. -- from Mr. Duff and from
21   Mr. Meyer, un-rebutted testimony, is that he did the
22   right thing on that ERP loan.  He was president.  The
23   ERP loan ran into problems.  The company ran into -- the
24   very problem that Mr. Duff who made the loan identified
25   as could be a problem, the sole vendor backed out.  Mr.
```

1   Sweatland who they put on by deposition, even he

2   admitted, well, you know, when the sole vendor backed

3   out, you don't have any revenue.  Did Mr. Meyer ignore

4   that?  No, he stepped up.  He did the right thing.  He

5   went straight to Mr. Duff, and he said, here's what's

6   going on.  Here's how I'm going to solve the problem.

7   They worked out a late payment plan.  That's what they

8   did.  They didn't just not pay.  They worked out a plan.

9   They went to the bank.  Now, of course, the bank put

10  them on the list saying, you know, there's late

11  payments.  But here's the plan.  He then worked -- when

12  Mr. Duff left -- with Mr. Copeland and Mr. Plummer.  He

13  did the right thing.  When continued issues were now the

14  vendor said he cancelled the contract, he said now, I've

15  got an issue, I've got another plan, I'll work to raise

16  money, I'll work to get ERP paid up as soon as possible,

17  and I'll also form another company.  I'm going to step

18  away from ERP, and they'll use the proceeds to pay off

19  the loan.  So, that plan was implemented.  Heard Mr.

20  Duff say so.  So, when Mr. Christie talked to Mr. Meyer

21  in June about this on a phone call, the only time he

22  ever talked to him, Mr. Meyer told him the truth.

23  There's been no default.  I haven't been told of any

24  default.  There's been no foreclosure action.  I'm not

25  in default.  I've worked out a plan.  I worked it out

1    with the bank.  I stepped up.  I did the right thing,
2    and I'm off of ERP now, but I've made sure the plan will
3    be successful.
4         THE COURT:  You have approximately eight
5    minutes left.
6         MR. HICKOX:  And then later on when -- when
7    ERP apparently didn't live up to their plan after he
8    left and the bank -- Mr. -- because he was a personal
9    guarantor, he made sure personally that loan was paid
10   off.  But you know, ladies and gentlemen, it didn't
11   matter to Mr. Christie that these allegations hadn't
12   been verified, that he took no independent steps to
13   verify these false rumors, didn't matter.  He didn't
14   care about sending this letter to Margo Conley, a public
15   official, making allegations about a personal default of
16   Alan Meyer that were not true.  He didn't care.  He
17   didn't have the character or the integrity, words he
18   used, to ask Mr. Meyer to meet him in his office and
19   say, let's call the bank.  That's all he had to do.  He
20   didn't do it.  When he made those allegations, ladies
21   and gentlemen, he didn't know if they were true or
22   false.  You heard him say it right here.  Wanton and
23   willful behavior, ladies and gentlemen.  It was just an
24   excuse.  He needed an excuse to terminate.  He needed an
25   excuse to terminate.  They wanted to move on.  They'd

1    gotten their $15 million. They'd gotten the benefit of
2    the services we'd given them. He needed an excuse. He
3    thought that he could do -- he thought the rules didn't
4    apply to him. He thought they'd slink back to Iowa and
5    wouldn't try to enforce the promises that he made to
6    them. He was wrong. So, they implemented their plan.
7    They organized The Bluffs the next day. They filed it
8    the next day. Days later, they bought the land. They
9    assigned it to The Bluffs. What does that sound like?
10   And then they obtained a construction loan on the
11   project. They had been planning this all along. Then
12   they hired First Management in place of Dovetail as the
13   general contractor, and they used Dovetail's work
14   product. Project development site had all ready been
15   developed and purchased. $15 million in incentives had
16   all ready been committed to, and the Kaw Valley site
17   design work and evaluations were all ready completed.
18   Mr. Malinowski testified that they were used in the
19   final design in the project. Mr. Figert's un-rebutted
20   expert testimony is that they were used. So, ladies and
21   gentlemen -- and by the way, ladies and gentlemen, more
22   importantly, they knew they were wrong on August 4th,
23   2005. Miss -- their own attorneys knew that there had
24   been a partnership, and that it was wrong, 'cause they
25   were looking for defenses against the partnership.

1    There were no defenses, ladies and gentlemen.  There are

2    no defenses to what they've done.  So, ladies and

3    gentlemen, we're here before you.  I'll just go over

4    this briefly.  You've seen this exhibit before.  We're

5    here before you to ask you for our fair share of what

6    they took from us, 50 percent of the joint venture

7    profits.  Un-rebutted testimony of Mr. Teel as to what

8    the value -- expert testimony as to the value of the

9    project that has been built and the value of the project

10   that might be built if the final phases are completed in

11   the future and Junction City provides an additional

12   $7 million, which they would have to do with the new

13   development agreement.  Mr. Christie tried to rebut that

14   testimony, but all he really said was, I'd have to sell

15   it for what I sell it for.  He never actually challenged

16   Mr. Teel's appraisal, because of course, he couldn't,

17   because they had tried to sell the property earlier for

18   that.  He wants to make you think that they're cash poor

19   now, and they won't sell, and there's no real profit in

20   it.  But he told you he's a success because that's what

21   he does for a living, holds opportunities until they're

22   profitable.  They think this is so valuable, they're

23   willing to put up another $5 million additional

24   collateral on this project.  We're going to ask you to

25   enter in 50 percent of the joint venture profits, Mr.

```
 1   Teel and Mr. Hausler's un-rebutted testimony, as to what
 2   that 50 percent is, as well as the amount of profit
 3   that -- that was earned by First Management to build it,
 4   instead of Dovetail.  Your Honor, I reserve the rest of
 5   my time.
 6            THE COURT:  At this time, defendants get an
 7   opportunity to make their closing statements to you.
 8   Mr. Kennedy.
 9            MR. KENNEDY:  Thank you, Your Honor.  Ladies
10   and gentlemen, sometime years ago, my mentor Bob Martin
11   told me that lawsuits are determined by the facts.  That
12   is the truest thing that I've ever heard about trial
13   practice.  That's the reason that we spend days and
14   weeks and sometimes months collecting and reviewing
15   documents, and you've seen all these notebooks full of
16   potential exhibits.  That's just a fraction of what was
17   looked at, and I think you even heard one of plaintiffs'
18   experts say that he'd looked at boxes of documents.  We
19   do that because the facts make a lawsuit.  And it's not
20   only the documents.  It's the people.  It's the people
21   that come before you and tell their stories to you, and
22   your job is to determine who you find credible, who you
23   believe, who you want to gp back into the jury room and
24   talk about with your colleagues, made the best
25   impression on you, was the most believable, is the
```

1   person that you want to rely upon.  One of the things

2   that I've learned doing this, and I'm sitting here this

3   morning thinking I'm coming up on 25 years, which is

4   kind of creepy in a way, but I don't have anything else

5   I can do.  In every lawsuit, somebody says something

6   that sort of summarizes the case, and I've seen it time

7   and time again, and in this case, those words came from

8   John Pratt's mouth.  Here's what he said, and this is a

9   direct quote:  David Christie is a logical man.  Maybe

10  you remember him saying that.  Never were truer words

11  spoken.  As part of that logical approach to business,

12  Mr. Christie in The Bluffs project and any other

13  development project that he involves himself in wants to

14  know the facts.  He wants to know who he's going to be

15  associated with, particularly if he hasn't worked with

16  them before, hasn't partnered with them before.  If he's

17  going to use an outside construction company, which is

18  the typical situation for him, he wants to know who they

19  are, what their capability are, what they've done.

20  That's why he asks for a contractors qualification

21  sheet, and that's why he asked for that in this case.

22  Mr. Christie, Mr. Glenn, any other real estate developer

23  wants to know the facts.  They want to analytically

24  evaluate the potential of a project before they commit

25  their resources and sign up for the risk that goes with

1494

1  each and every one of those projects.  You have been
2  wonderfully attentive.  I was talking to Mr. Geiger
3  about that this morning during our unforeseen recess,
4  and I can't think of another jury trial, and I've done a
5  few, where the jurors were more engaged, more attentive,
6  more interested in what was going on, and from time to
7  time, it couldn't possibly have been that interesting,
8  and I commend you for your attention, and I know that
9  Mr. Pratt, Mr. Meyer, Mr. Christie, Mr. Glenn, everybody
10 involved in this that felt that they needed to have
11 their day in court truly appreciate your attention.
12 Now, having said that, I'm not going to insult your
13 intelligence and try to summarize eight days worth of
14 testimony and exhibits.  But I do want to talk about a
15 few of the facts that I think are critically important.
16 First, there's no question but that the parties met in
17 Junction City on March 4th, 2005 to evaluate The Bluffs
18 project.  No question at all.  The question I guess
19 comes in, what happened at the end of that day before
20 they left the site, The Bluffs project.  There's also no
21 question but that the parties were interested in the
22 project.  They wanted to evaluate it.  And I guess the
23 real difference that comes into play here is, were they
24 evaluating this as partners on that date and from those
25 days forward -- from that date forward, or were they

1    evaluating this, doing the sort of due diligence that

2    you've heard about from a number of the witnesses to see

3    if this thing was logical, to see if this thing made

4    sense?  Clearly, activity happened.  And one of the most

5    important activities that happened factually, and we

6    heard this from Mr. Duff, is that about a month later,

7    and in looking at some records last night, it looks like

8    it was actually April 4th, 2005, at a meeting in

9    Mr. Christie's office, either Mr. Meyer or Mr. Pratt

10   says, we want to be your 50/50 partners in this deal.

11   We want to be your partners.  We don't want to just

12   build the thing.  We want to be partners.  Mr. Duff's

13   recollection, Mr. Christie's recollection was that, no,

14   I'm not ready to do that.  That's what David told them

15   at that time.  That would be suggestive of the idea that

16   there was no partnership on March 4th, and that the

17   parties were simply looking at this thing to see if it

18   made sense.  Clearly, at that point, the Dovetail people

19   thought it made sense and wanted to become equity

20   players.  We go to Las Vegas mid May 2005.  There are

21   conversations about financing people that are in

22   Mr. Christie's booth at the convention.  We have the

23   city commission meeting with the POWERPoint presentation

24   in early June.  Somebody called it a dog and pony show.

25   I've heard that before.  It's a typical part of the

1    development process.  You go to the -- the entity that

2    is going to fund the project, you show them what you're

3    doing, so that they can see that this thing makes sense

4    and that they ought to continue looking at it.  It's not

5    a partnership at that point.  We have the golf

6    tournament on June 10th, 2005 where Mr. Christie learns

7    for the first time that Security Savings, one of the

8    potential lenders in this deal, would loan money to he

9    and Alex but not to Dovetail.  That's a key element of

10   what's going on here.  And that's the reason that we

11   read Mr. Sweatland's testimony to you, so that you could

12   get a feel for exactly what happened there.  For a

13   period of time thereafter, there are discussions among

14   the parties about this ERP issue.  Looks like that went

15   on from about June 11th of -- of -- to the 21st of 2005.

16   The evidence is that Mr. Meyer resigns as the managing

17   member, the quarterback of ERP, either June 13th or

18   15th.  Coincidence?  I'll leave that to you to decide.

19   We see from documents that the plaintiffs have provided

20   you that until June 29th, 2005, that loan is in default,

21   Security Savings believes that's a problem loan, and

22   that's information that Mr. Christie and Mr. Glenn got

23   from Mr. Sweatland on June 10th.  Mr. Christie tries to

24   investigate that, and he goes back to the party that

25   brought Dovetail to the table, Mr. Duff.  Mr. Duff

1    inquires.  Ultimately, Mr. Christie and Mr. Meyer talk
2    about this.  Mr. Meyer says everything is fine.  I've
3    made arrangements to make a payment.  Everything's good.
4    And on that basis, we continue.  And we go right up to
5    the -- the execution of the MOU on July 5th, 2005.  At
6    the very same time, Mr. Duff is trying -- as part of his
7    due diligence into what's going on with ERP and
8    Mr. Meyer, goes camping with one of the principals of
9    Security Savings Bank, and it's reiterated to him that
10   this loan is a problem loan.  That is reported to
11   Mr. Christie after the MOU is signed.  And you can take
12   Mr. Hickox's suggestion that they got the MOU and a
13   promise of $15 million and then kicked Dovetail to the
14   curb, but that's not the chronology.  The chronology is
15   that David and Alex continued to believe there was
16   potential in working with these guys, until they learned
17   again that there was a problem with Mr. Meyer's
18   financial capabilities.  The MOU is signed by the city.
19   And we'll talk about one of the instructions here in a
20   moment, but that MOU in no way, shape or form
21   memorializes any kind of an agreement between Meyer and
22   Pratt on the one hand and Christie and Glenn on the
23   other.  Then we get to July 13th, 2005.  And one of the
24   truly critical pieces of fact comes out.  That's
25   Mr. Pratt's e-mail that follows the conversation that he

 1    had -- sorry -- follows a conversation that he had with
 2    Alex Glenn.  First, it confirms that Mr. Christie was
 3    gone during this time, and most significantly, belying
 4    the idea that there's some completed partnership in
 5    place as of March 4th, 2005, in his own words, Mr. Pratt
 6    says, items that we need to complete the Junction City
 7    partnership.  We need to complete our partnership
 8    agreement.  Alex said that the two of you had some
 9    concerns that you want to get into the agreement.  If
10    there are any deal breakers that we can't iron out, I'd
11    like to know.  Ladies and gentlemen, this is proof
12    positive that there was no partnership agreement on
13    July -- on -- on March 4th, 2005, or at any other time
14    up to the time that Mr. Christie terminated going
15    forward with the Dovetail people.  Mr. Christie is angry
16    when he learns that he doesn't believe Mr. Meyer's been
17    honest with him.  Does he have the right to rely upon
18    Mr. Duff for this information?  Well, that's for you to
19    decide.  But I would suggest to you that Mr. Duff
20    brought these people together.  Mr. Duff has been a
21    trusted business confidante of everybody on either side
22    of the caption in this case.  David trusted him.  David
23    had a right to rely upon him, and pull the plug.  That's
24    one of the beauties of this country is that we have the
25    freedom to associate with whom we want to associate

1   with.  Based on Jim Duff and the information that he got

2   from him, based on his experience and his desire to

3   protect his -- his credibility, his net worth, his

4   reputation with Junction City and elsewhere as a

5   developer, and to proceed with this thing in a logical

6   cautious way, Mr. Christie elects to proceed without

7   Dovetail.  He had the freedom to do that, ladies and

8   gentlemen.  He had the freedom to do that.  Let me point

9   you if I may to a couple of the instructions that the

10  court has given you.  First, Instruction 13.  Mr. Hickox

11  said a number of things that I actually agreed with this

12  morning.  Not everything.  But a few things.  And one of

13  the things is that a joint venture agreement, a

14  partnership agreement doesn't have to be in writing.

15  That's true.  That's absolutely true.  It's also unusual

16  that you would have no memorialization of any kind

17  whatsoever of people's intention to build 130,

18  $150 million apartment complex.  That's a remarkable

19  thing, ladies and gentlemen.  But relying on Kansas law,

20  the court has instructed you as to what you should look

21  at to determine whether or not there is a joint venture.

22  And I would submit to you when you go through these

23  factors, you're going to determine that that had -- that

24  this deal had not gotten to that point.  There was no

25  partnership, there was no agreement, there was simply

 1    the typical due diligence that goes on in a case of
 2    every significant development deal.  These factors don't
 3    apply to these facts.  It's that simple.  Does the MOU
 4    address any of these issues?  Certainly not.  Certainly
 5    not.  And when you go back and spend some time with this
 6    instruction and think about what you've heard, I'm
 7    confident that you're going to agree that I'm right.
 8    Let me also point you to Exhibit 17, and there's been
 9    the suggestion that Mr. Christie and Mr. Glenn take
10    these people's capabilities, they get the MOU, they get
11    a promise of $15 million and a non-binding agreement
12    from the city which they ultimately received part of,
13    that's true, but that they have been unjustly enriched
14    by all of the hard work that Mr. Meyer and Mr. Pratt and
15    their colleagues put into this deal.  Well, if you think
16    about the evidence, the only thing that pre-dated the
17    dissolution of the relationship and that Mr. -- and that
18    has remained part of the project is some of the very
19    preliminary site work, and we saw Mr. -- Mr. Pratt's
20    sketch.  Clearly, that was one of the things that he
21    brought to the table.  But let me remind you about some
22    other evidence in this case, evidence that he was
23    working with Kaw Valley, an entity that had worked with
24    Mr. Christie many times in the past, and an entity that
25    was paid by Mr. Christie for the work that they did on

    1    this project.  When you go back and consider the
    2    elements of unjust enrichment, I think you're going to
    3    find that simply nothing that happened during the due
    4    diligence phase rose to the level where it would be
    5    unfair for you not to award something to the plaintiffs.
    6    If you apply logic to the evidence that you've heard,
    7    the facts simply don't support the notion that there was
    8    a binding joint venture, a binding partnership between
    9    these people.  When you don't have the facts, what you
   10    do is try to put on the best lawsuit money can buy.  And
   11    you've seen that here.  And I commend the plaintiffs for
   12    that.  The graphics, the DVD's with the exhibits,
   13    blowing them up, turning them sideways, everything else.
   14    It's helpful to all of our understanding of what's going
   15    on.  You've also heard from their experts.  Mr. Figert
   16    receives $50,000 to work 200 hours on this project.  And
   17    you heard his opinions, and you heard him say that he'd
   18    looked at their sites.  He'd gone, seen their offices,
   19    gone to Florida, looked at what they'd built in Iowa.
   20    But amazingly, the one thing that he doesn't ask anybody
   21    is, how long did it take you to build what you've built?
   22    I don't think they got much for their $50,000, ladies
   23    and gentlemen.  And again, if you don't have the facts,
   24    that's what you do.  It's a flawed opinion, and -- and a
   25    mistake in his work that's patently obvious.  They've

1  also paid $65,000 plus to Mr. Teel and Mr. Hausler to
2  tell you that they should receive $15 million.  Well,
3  let me -- let me first point out, neither of these
4  gentlemen would even do minute -- minute one work on
5  this project without an -- a signed agreement and some
6  money up-front, and I don't blame them.  I wouldn't have
7  done it either.  That's the way the world works.  But
8  again, what they've told you is materially flawed.
9  Mr. Teel, the appraiser, has a lot of experience, has
10  been in court a lot, ignores the cost approach which
11  is -- which is a -- an appraisal method typically used
12  by appraisers.  It's one of the three methods that are
13  used, and his report is correct there.  He basically
14  ignores comparable sales, because there are none, and
15  there's some truth to that.  He uses that as a check
16  point.  But what he does to get to the place then where
17  Mr. Hausler can talk about money is take the income
18  approach, and admittedly, what he has done is take the
19  income for a brief period of time on 300 plus units,
20  32-units in Phase One B, add that together, pretend that
21  there's going to be 800 more units built that will have
22  the same income experience from those units and other
23  similar apartment complexes in the area, and take that
24  out to the end.  It's -- it's unbelievable, ladies and
25  gentlemen.  It's hypothetical.  It's fictitious.  It's

```
 1    unreal.  Mr. Hausler relies upon the appraisal, and then
 2    ultimately gets to his bottom line number by talking
 3    about a hypothetical sale that even Mr. Teel says is
 4    unlikely and probably a poor idea in today's financial
 5    climate.  If you decide that the plaintiffs are right,
 6    and you go back and start looking at dollars, just
 7    remember this.  What we're talking about here are
 8    hypothetical damages from the hypothetical sale of 800
 9    hypothetical apartment units that likely will never be
10    built.  That's how you get to the number that Mr. Hickox
11    and the plaintiffs are asking you to award.  That's
12    exactly how they get there.  The plaintiffs also seek
13    almost 120,000 in un-reimbursed expenses.  Now, let me
14    remind you of some testimony in this case.  When this
15    deal came apart, Mr. Christie offered to pay them for
16    their expenses and what they had done up to this point,
17    and they refused.  They were unwilling to do that.  They
18    said, well, it's not fair, we're not your employees,
19    you'll be hearing from us.  At that time, they were
20    angry, they were hurt.  They'd lost a big opportunity,
21    probably the biggest that had ever been presented to
22    them.  They saw a great opportunity slip away.  Well,
23    whose opportunity was it in the first place?  I think
24    it's absolutely clear from everything that you've heard
25    that because of his relationship, because of their
```

 1    relationship with Junction City, Junction City was
 2    looking to Mr. Christie and Mr. Glenn to bring them
 3    apartments.  They had a good experience with them in the
 4    past, they were hoping that they'd have a good
 5    experience in the future.  And you heard Miss Conley's
 6    testimony by videotape yesterday.  She'd seen the
 7    apartments that she'd worked hard on, was thrilled with
 8    what they'd been able to accomplish, thought it was a
 9    great thing for Junction City.  The evidence is
10    absolutely clear that this opportunity was David and
11    Alex's and theirs alone.  Now, when the plug is pulled
12    on the business relationship between my clients and
13    Dovetail, do they do anything to try to pursue the
14    opportunity independently?  Well, they talked to
15    Junction City.  I think Mr. Pratt said he went over and
16    met with them.  Junction City was committed to working
17    with Mr. Christie because of their experience, because
18    they knew he could deliver, because it was the logical
19    thing for them to do at that point.  Instead of trying
20    to do something on their own, the plaintiffs do nothing.
21    They do absolutely nothing.  They could have tried to
22    gum up the works by a lawsuit filed immediately, knowing
23    then that they felt they'd been wronged and treated
24    badly, they'd been pushed to the -- pushed to the curb
25    by Mr. Christie and Mr. Glenn, that they'd been partners

1    at that point for several months, but they don't do

2    that.  They don't do that.  They don't take any of the

3    risk.  They let Mr. Christie and Mr. Glenn and the other

4    members of The Bluffs move forward.  They watch the

5    development of the project.  They see that it appears to

6    be a success, and they file this lawsuit seeking half of

7    what Mr. Christie, Mr. Glenn and the others have assumed

8    the risk to do and have done all the hard work to

9    accomplish.  It's not fair.  It's absolutely not fair.

10   Let me close with a story.  Mr. Hickox told you a story,

11   so I'll do the same.  Doesn't involve tea cups.  There's

12   a young woman who is lucky in business, unlucky in love,

13   and she has a friend who's a banker who knows someone

14   that he thinks might be a good match for her.  So, he

15   set 'em up on a blind date.  Wasn't completely a blind

16   date.  They'd actually met at a social event, exchanged

17   pleasant-- exchanged pleasantries a few months before.

18   So, they go on their date, and she spends a few hours

19   showing him her home town.  He's from a neighboring

20   state.  They look around the town, they go up on top of

21   a hill, kind of a typical place where young people go to

22   become acquainted.  They look each other in the eye, and

23   they say, you're the one for me, let's get married.  The

24   young woman goes home.  She tells her parents, hey, I

25   met this guy tonight, we went on a date, we're going to

1   get married.  Parents are incredulous.  What do you know

2   about this guy?  What does he do?  Does he have a good

3   job?  Is he educated?  What's his story?  The thing

4   moves forward.  They get to know each other.  The young

5   lady begins to have reservations.  Maybe the guy doesn't

6   have the great job that he said he had.  Maybe he's not

7   exactly legit.  So, she decides a few months later, even

8   though there had been wedding plans taking place,

9   registered for gifts, all the usual wedding stuff, says,

10  I just can't do this.  I just can't do this.  So, she

11  tells the young man, no, we're not going to get married.

12  He's hurt.  He feels like he's been jilted.  We can all

13  understand that.  We'd probably maybe not been there in

14  terms of marriage, but we've been there in

15  relationships.  He goes, he takes the news, he's

16  unhappy, he complains.  The young lady has relied upon

17  information she got from the mutual friend that set 'em

18  up.  Time passes.  She does well.  She does well.  Her

19  business flourishes.  Her love life remains not so good.

20  But business is great.  And two years later, the young

21  man comes back and says, I want half of what you've done

22  the last two years.  We were going to get married.  Is

23  that the lawsuit that we're here trying and that you

24  have to decide today, ladies and gentlemen?  No.  But it

25  has parallels.  It has real parallels.  And what I would

1    submit to you is that in this country, under the law

2    that the court has given you with its instructions,

3    people have the right to make decisions about who they

4    want to associate with, and they have the right to make

5    informed decisions based upon information they get from

6    trusted advisors.  That's exactly what happened here.

7    Those are the facts.  Mr. Christie had every reason to

8    step away from this deal and pursue it with others.

9    There was no partnership.  There was no joint venture.

10   In their own minds, I think because they haven't had the

11   experience of doing third party development deals,

12   Mr. Pratt and Mr. Meyer may truly think there was a

13   partnership.  I'm open to that.  But under the law of

14   Kansas, under the instructions that you're going to be

15   given, but most importantly, ladies and gentlemen, under

16   the fact of this case, there was no partnership.  I know

17   you're going to go back in that room and do what you

18   believe is fair, appropriate, and logical.  Thank you.

19              THE COURT:  At this time, plaintiff has the

20   remaining amount of time to make the rest of their

21   closing statements.  Mr. Hickox, you have the time left

22   that's on the --

23              MR. HICKOX:  Thank you, Your Honor.  Thank

24   you again.  Of course, Mr. Christie had a right to

25   terminate the relationship, as long as he did it

1   according to the law.  That's not what he did.  He
2   wrongfully disassociated.  He wrongfully terminated, and
3   walked away and stole the opportunity for The Bluffs LLC
4   that he formed afterward.  Nobody disputes that he
5   didn't have the right.  Mr. Meyer and Mr. Pratt
6   testified that all he had to do was settle up.  They
7   even offered ways to do that when he terminated.  They
8   offered ways, we'll buy you out.  I'll buy Mr. Meyer
9   out.  So, the issue here, ladies and gentlemen, is in
10  fact, whether or not Mr. Christie is logical.  We've all
11  ready told you why it was logical to enter into this
12  development -- the partnership on March 4th.  The reason
13  statements of the parties that are important here is
14  what Mr. Christie said to you yesterday, you have to own
15  what you do.  And that's all we're asking for you to do,
16  ladies and gentlemen.  When I came to you at the
17  beginning of this trial, I said we were here to ask you
18  to right a wrong.  We're here to ask you to have
19  Mr. Glenn and Mr. Christie own up to what they did.
20  Mr. Christie wouldn't have it any other way, apparently.
21  We're only asking for what's fair, the 50 percent
22  promise that they made us.  And you get to determine in
23  the jury room by looking at Joint Exhibit 834, you'll
24  draw your own conclusion as to, because of the breach of
25  this partnership, what was taken from my clients?  I

1    want to point out two pieces of evidence very quickly.

2    Can you bring up Joint Exhibit 415, Defendants'

3    Exhibit 415, Josh?  I want to point out -- if you could

4    highlight that paragraph that starts, we need to

5    complete our partnership agreement.  I want to point out

6    that when Mr. Kennedy read that to you, and by the way,

7    that's the only document in this case that they've got

8    that's their one piece of evidence, you know, against

9    all the other evidence that we have.  And it's -- I want

10   to point out that he kind of read it to you wrong,

11   because what it says is, we need to complete our

12   partnership agreement preferably prior to Junction City

13   voting on the development agreement.  The next sentence

14   then talks about the development agreement, what

15   Mr. Pratt testified to.  Mr. Kennedy didn't quite read

16   it that way when he read it to you before, and then

17   finally, Mr. Kennedy mentioned -- can you bring up Joint

18   Exhibit 994 -- mentioned that Joint Exhibit 994 proved

19   that the loan was in default.  First of all, ladies and

20   gentlemen, you saw this.  Joint Exhibit 994.

21   Mr. Christie had never seen this until after the

22   lawsuit.  He didn't rely on it.  And no the word default

23   never is in there.  When Mr. Christie wrote that letter

24   on July 15th to Mr. Christie, he testified he didn't

25   know whether it was true or false.  It was false.  And

1    this document doesn't prove it.  Ladies and gentlemen,

2    what's fair is that we're asking you to say that in this

3    great state of Kansas, when outside parties come into

4    this state and they enter into an agreement, we're

5    asking you to make sure that they can rely on the fact

6    that in the law of Kansas, your word is your bond.

7    That's why the instruction was read to you.  Your word

8    is your bond.  We ask -- we're just simply asking them

9    to honor their word.  Ladies and gentlemen, once again,

10   I want to thank you.  You've been a very attentive jury

11   as Mr. Kennedy stated.  We have no problem, as I told

12   you in the beginning of this trial, of putting our trust

13   in you to evaluate the evidence that you have, and have

14   no problem and are confident that you will deliver the

15   fair and impartial verdict that we seek.  Thank you.

16              THE COURT:  At this time, jury members, if

17   you could turn to that last part of your instructions.

18              (Court read final instructions to the jury.)

19              THE COURT:  And on the original, it's dated

20   today's date, and I've put my signature.  And you'll

21   have the original instructions as well as the original

22   verdict form with you.  At this time, if the bailiffs

23   will please stand and raise their right hands.

24              (Court swore the bailiffs, Jennifer Walton

25   and Larkin Walsh.  Both replied "I do.")

1      THE COURT:  Okay.  At this time, jury
2   members, the court's going to stand in recess.
3      MS. WALTON:  Court is in recess.  All rise.
4      (11:31 AM, jury left.)
5      THE COURT:  Court stand in recess.  Miss
6   Walton will be returning to the courtroom to get with
7   counsel in regards to the gathering of the exhibits.
8   Jury's getting started right now.  When they actually
9   take their lunch, we don't have them come back into the
10   courtroom.  We just have them leave, re-gather, and then
11   start the deliberations.  If in case we do need to
12   contact the parties, please share with Miss Walton how
13   we'll be able to do that.  Just leave -- you're welcome
14   to stay in the courthouse in your rooms, but if for some
15   reason you're going to leave, please don't leave, go
16   very far, and have a cell phone or something for us in
17   order to contact you.  Thank you.  Court stands in
18   recess.
19      (Whereupon court took a recess.  Proceedings
20      then continued as follows:)
21      (Court returned to bench at 3:40 PM.)
22      THE COURT:  Back on the record.  Court's
23   been informed that the jury has reached a verdict.  Call
24   the jury back.
25      (Jury entered court at 3:41 PM.)

1          THE COURT:  I've been told that the jury has

2    reached a verdict.  As you walked in, I noticed that

3    Miss Heiman had the envelope in her hand.  Has the jury

4    reached a verdict?

5          MS. HEIMAN:  Yes, we have.

6          THE COURT:  If you'll please give the

7    envelope to the courtroom deputy, Miss Walton.  At this

8    time court is going to read the verdict form.  It

9    states, we the jury in the above entitled case duly

10   impaneled and sworn upon our oaths do make the following

11   answers to the questions propounded by the court.

12   Number one, do you find that Alan Meyer, John Pratt,

13   David Christie and Alexander Glenn formed a joint

14   venture to pursue a residential development in Junction

15   City Kansas on or about March 4th, 2005?  And what's

16   marked is yes.  Number two, do you find defendants

17   Christie and Glenn entered into the joint venture

18   agreement due to a mistake concerning plaintiffs'

19   experience or expertise in residential development

20   and/or due to a mistake concerning plaintiffs' financial

21   ability to pursue a residential development in Junction

22   City Kansas, and that plaintiffs were aware of or had

23   reason to know of or cause this mistake?  And what's

24   checked is no.  Number three, do you find defendants

25   Christie and Glenn breached the joint venture agreement

1   with Meyer and Pratt?  What's marked is yes.  Number
2   four, do you find defendants Christie and Glenn violated
3   any fiduciary duties owed to plaintiffs Meyer and Pratt?
4   And what's marked is yes.  Number five, do you find
5   defendants Christie and Glenn wrongfully disassociated
6   from the joint venture with Meyer and Pratt?  What's
7   marked is yes.  Number six, do you find defendants
8   conspired to wrongfully take the opportunity to develop
9   The Bluffs apartments for themselves and without
10  plaintiffs?  And what's marked is yes.  Number seven, if
11  you answered yes to Question Number Seven -- Question
12  Number -- which defendants do you find participated in
13  the conspiracy?  And defendant David Christie?  What's
14  marked is yes.  Defendant Alex Glenn?  What's marked is
15  yes.  Defendant DJ Christie Inc?  What's marked is yes.
16  Defendant The Bluffs LLC?  What's marked is yes.
17  Question Number Eight, if you answered no to all the
18  Questions Three through Six, please proceed to Question
19  Number Ten.  If you answered yes to any of the Questions
20  Three through Six, what amount of damages do you find
21  was sustained by plaintiff?  Please enter the amount of
22  damages in dollars and cents for the following elements
23  of damages you find, if any, were sustained by
24  plaintiff.  A, says Meyer and Pratt's loss in connection
25  with interest in the joint venture.  I have a question

```
1    in regards to that amount.  There's a figure, but then
2    it appears there's a figure that's maybe not complete.
3    I may have to show Miss Heiman that.  Miss Walton.  That
4    first line.
5              MS. HEIMAN:  I don't understand.
6              THE COURT:  After the 63, if you see that?
7              MS. HEIMAN:  There's a dot 00.
8              THE COURT:  Okay.  So, what would be the
9    amount then?
10             MS. HEIMAN:  7,170 -- oh -- 603, so there is
11   a figure missing there.
12             THE COURT:  So, there -- what is the amount
13   in that?
14             MS. HEIMAN:  $7,170,603.
15             THE COURT:  In regards to that, Mr. Alonzo,
16   is that your verdict in regards to that amount?
17             MR. ALONZO:  Yes.
18             THE COURT:  Mr. Hammer?
19             MR. HAMMER:  Yes.
20             THE COURT:  Miss Schrantz?
21             MS. SCHRANTZ:  Yes.
22             THE COURT:  Miss Ettinger?
23             MS. ETTINGER:  Yes.
24             THE COURT:  Mr. Lammers?
25             MR. LAMMERS:  Yes.
```

```
 1              THE COURT:  Mr. Adams?
 2              MR. ADAMS:  Yes.
 3              THE COURT:  Mr. Carter?
 4              MR. CARTER:  Yes.
 5              THE COURT:  Okay.  If you'll please hand
 6    that back.  In regards to Line A, Meyer's and Pratt's
 7    loss in connection with the interest in the joint
 8    venture, $7,170,603 for Line B.  Plaintiffs' lost
 9    general contractor and in house subcontracting profits,
10    $1,097,372.  For Line C, plaintiffs' un-reimbursed out
11    of pocket expenses, $118,370.  Total damages is
12    $9,195,805.  Question Nine, if you answered yes to
13    either Question Four or Six and you awarded actual
14    damages to plaintiffs in Question Number Eight, do you
15    find by clear and convincing evidence that punitive
16    damages should be assessed against the defendants?
17    What's checked is yes.  Number Ten, do you find
18    defendants were unjustly enriched by knowingly retaining
19    a benefit from efforts undertaken by plaintiffs to
20    further the object of the joint venture, which was to
21    develop The Bluffs apartments, without paying plaintiffs
22    for the value of that benefit?  What's marked is yes.
23    If you answer yes to Question Number Ten, what is the
24    value of that benefit conferred by plaintiffs on
25    defendants in connection with the development The Bluffs
```

1   apartments?  What's written down is $5,500,000.

2   Question 12, is your verdict as to each of these

3   questions in the above entitled case unanimous?  What's

4   checked is yes.  Dated 5/21/09 and signed by Patti

5   Heiman.  Is there any requests from the parties in

6   regards to the jury's verdict?  Any from the plaintiff?

7              MR. HICKOX:  No, Your Honor.

8              THE COURT:  From defendant?

9              MR. DENNING:  Your Honor, we'd have a motion

10  at this time.  I don't know if you want to do it in

11  front of the jury or --

12             THE COURT:  Are you asking that the jury be

13  polled in regards to their verdict?

14             MR. DENNING:  Yes, Your Honor.

15             THE COURT:  At this time, jury members, the

16  parties have a right to ask that the court inquire of

17  each individual juror member as to whether or not what

18  the court read is actually your verdict in this case.

19  So, in regards to that, Miss Heiman, is what the court

20  read your verdict?

21             MS. HEIMAN:  Yes, it is.

22             THE COURT:  Mr. Alonzo?

23             MR. ALONZO:  Yes, it is.

24             THE COURT:  Mr. Hammer?

25             MR. HAMMER:  Yes, it is.

1    THE COURT:  Miss Schrantz?

2    MS. SCHRANTZ:  Yes, it is.

3    THE COURT:  Miss Ettinger?

4    MS. ETTINGER:  Yes.

5    THE COURT:  Mr. Lammers?

6    MR. LAMMERS:  Yes.

7    THE COURT:  Mr. Adams?

8    MR. ADAMS:  Yes, it is.

9    THE COURT:  Mr. Carter?

10   MR. CARTER:  Yes.

11       THE COURT:  Anything else in regards to the

12   jury?  If not, at this time, juror members, a couple

13   things.  First of all, I want to thank you for your

14   service in our court.  As you recall the very first day

15   you were here, the court told everyone on the panel how

16   important jury service is, and how this civic obligation

17   is one that each one of us hopefully responds to when

18   called to do so.  It's something that I would tell you

19   is not the easiest thing to do.  People are interrupted

20   in their daily routines.  But again, the court thanks

21   you for honoring your jury summons.  I've been

22   instructed to tell you that from this point, you are

23   excused from your jury summons.  You don't have to call

24   that number in the future.  Also, I'll tell you at this

25   time, we have a local rule here which involves any

1   communication with jurors after a jury has returned a
2   verdict.  I'm going to share that local rule with you.
3   No juror has any obligation to speak to any person about
4   any case, and may refuse all interviews or comments.  No
5   person may make repeated requests for interviews or
6   comments after a juror has expressed his or her desire
7   not to be interviewed or questioned.  Under no
8   circumstances except by order of the court in its
9   discretion and under such terms and conditions as it
10  shall establish shall any party or any party's attorney
11  or their agents or employees examine or interview any
12  juror either orally or in writing, nor shall any juror
13  consenting to be interviewed disclose any information
14  with respect to the specific vote of any juror other
15  than the juror being interviewed or the deliberations of
16  the jury.  With that in mind, at this time, you are
17  excused.  One thing I will mention.  What this court
18  sometimes does is make an offer to you for any one of
19  you that wants to stay for just a brief amount of time,
20  if you want to talk to me.  That's up to you.  You don't
21  have to stay if you don't want to.  You're free to go at
22  this point.  But again, thank you.
23              (Jury left at 3:52 PM.)
24              THE COURT:  At this point, I would just
25  mention that based on the jury verdict, parties in this

1    case, the plaintiff should provide the court with a

2    judgment form reflecting the verdict.  Parties are aware

3    of the time frames involved with any post-trial motions

4    that they intend to make.  Unless there's anything else

5    from the parties at this point?

6              MR. HICKOX:  Not from plaintiffs, Your

7    Honor.

8              MR. DENNING:  Not from defendant, Your

9    Honor.

10             THE COURT:  At this time the court is

11   adjourned.  Thank you.

12             MR. HICKOX:  Thank you, Your Honor.

13             (Whereupon, court recessed proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5

6      I, Nancy Moroney Wiss, a Certified Shorthand Reporter

7   and the regularly appointed, qualified and acting

8   official reporter of the United States District Court

9   for the District of Kansas, do hereby certify that as

10  such official reporter, I was present at and reported in

11  machine shorthand the above and foregoing proceedings.

12     I further certify that the foregoing transcript,

13  consisting of Day Nine - Pages 1450-1520, is a full,

14  true, and correct reproduction of my shorthand notes as

15  reflected by this transcript.

16     SIGNED July 1, 2009.

17

18                    S/_____

19                    Nancy Moroney Wiss, CSR, CM, FCRR

20

21

22

23

24

25